# THE C. D. BRYANT.

*(District Court, D. Oregon. March 18, 1884.)*

1. **SALVAGE BY PILOT.**

    Under the Oregon pilot act of 1882, (Sess. Laws, 15,) a pilot is bound to render aid to a vessel " in stress of weather or in case of disaster," and he is not entitled to salvage for such service unless he is thereby involved in " extraordinary danger and risk."

2. **CASE IN JUDGMENT.**

    The libelant in a smooth sea and calm weather boarded the Bryant in a thick fog, while she lay aground at low tide on the outer edge of the middle sand of the Columbia river, and at the next flood sailed her over into deep water in the south channel, and, after drifting out to sea in the night, brought her into port the next morning. *Held,* that the service of the libelant did not involve any "extraordinary danger or risk," and that he was only entitled to a pilot's compensation therefor.

In Admiralty.

*Frederick R. Strong,* for libelant.

*M. W. Fechheimer,* for claimant.

DEADY, J. The libelant, Henry Olsen, brings this suit to obtain a decree for salvage against the American bark C. D. Bryant and her cargo, for services rendered her at the mouth of the Columbia river on September 4 and 5, 1883. The master of the Bryant, James P. Butman, intervening for his interest and that of his co-owners in the vessel, as well as the owners and consignees of the cargo, answers the libel, denying that the libelant performed any salvage service on the occasion in question, and alleging that he acted as bar pilot merely, for which service he was duly paid. The evidence is very voluminous, and, as usual in such cases, is largely irrelevant, immaterial, and repetitious. The material facts appear to be that on September 4, 1883, the Bryant being bound on a voyage from Hong Kong to Portland, drawing about 19 feet of water, was off the mouth of the Columbia river, when, about 2:30 P. M., and near high water, she grounded on the outer edge of the middle sand in 12 to 15 feet of water at low tide, and about three miles south-west of Cape Disappointment light—the sea being smooth, the weather calm, and a thick fog or smoke on the bar; that about 5 o'clock she was boarded by the libelant, a bar pilot from the pilot-schooner Cousins, who thereupon took charge of her; that the vessel lay quietly in her bed in the sand after the libelant took charge, until the flood tide began to make, and the wind freshened from the north-west, when with the aid of her sails and the swell of the sea she rubbed across the sand some time before 3 o'clock on the morning of the 5th, in a south-easterly direction, into deep water, and was afterwards carried by the ebb tide and an easterly wind in a south-westerly direction to sea, where she laid off until daylight, and then came in over the bar with a light breeze and the flood tide, and was taken in tow by a tug, and brought to Astoria and beached with three or four feet of water in her

hold; that the vessel commenced to leak before 9 o'clock in the evening of the 4th, and continued to do so until beached in the mud at Astoria, both pumps being worked continuously in the mean time, which leak was wholly caused by the displacement of 30 or 40 feet of the after-part of the keel, while on the sand as aforesaid; and that the vessel is worth $15,000, and her cargo, which consists of rice and China goods, is worth about $50,000.

Much of the testimony and controversy in the case relates to the question whether the conduct of the libelant, while in charge of the vessel, was that of a skillful and diligent pilot or not. For instance, it appears that soon after boarding the vessel, while the tide was ebbing to the south-west and a light breeze was blowing from the north-west, the libelant caused the port anchor to be dropped from the cat-head and went below to change his clothes, which were wet, and take some rest, where he remained until near 9 o'clock, when, at the suggestion of the master, he came on deck and had the anchor taken up, because the master insisted that the vessel was surging ahead—taking chain—and would soon be on the anchor, all of which the libelant denied at the time and since. Upon the vessel being brought to Portland and hove down, it was found there were some bruises and indentations well forward on her port side, which were thought to have been made by the vessel coming in contact with the fluke of the anchor while she lay on the sand. All of them were mere surface bruises, the wood in the worst one not being bruised more than three inches deep, and were all repaired by cutting out the bruised portions and letting in a scarf-piece in its place at a comparatively small cost, and did not at all affect the tightness of the vessel or cause her to leak. So far as appears, the dropping of this anchor was a useless act. It might prevent the vessel from going off as she went on, of which there was not the least probability at that time, if ever; and it was impossible for her to go further on until the tide flooded. At the same time it was certainly a harmless act, provided it was taken up, as it was, before the flood-tide commenced to make; and even then, with the heave of the sea and the wind, both from the north-west or thereabout, the vessel would be driven, not upon the anchor, but to the southeast of it.

But the management of this anchor, whether skillful or unskillful, does not affect the libelant's right to salvage. If any damage was caused to the vessel by the neglect or want of skill on the part of the libelant in this respect, at most, the amount thereof could only be deducted from the salvage to which the libelant might otherwise be entitled. But no claim is made in the pleadings for any damage on this account, and it is doubtful if any was sustained. If, under the circumstances, the act was bad seamanship, it is a matter for the consideration of the pilot commissioners, and not a defense to this suit. Salvage service is a meritorious one, and it has always been the policy of the law to reward liberally those who successfully engage

in it, according to the skill, danger, and property involved in the undertaking. But the drift of American legislation and decision is against the policy of allowing pilots to act as salvors on their own pilot grounds. It has been thought or found that the temptation to become a salvor might induce a pilot to make or allow an occasion for such service that he might profit by the distress of the ship which he is bound to navigate. *Hobart* v. *Drogan*, 10 Pet. 120; *The Wave*, 2 Paine, 136; 2 Pars. Ship. & Adm. 271. A pilot is a public officer whose duties and compensation are prescribed by law; and when acting in the line of his duty he is not entitled to any other compensation. As was said by Mr. Justice WASHINGTON, in the *Case of Le Tigre*, 3 Wash. C. C. 571, while considering the question whether official duty could be compensated by salvage:

"Of this class of cases is that of the pilot who safely conducts into port *a vessel in distress at sea*. He acts in the performance of an ordinary duty, imposed upon him by the law and the nature of his employment, and he is therefore not entitled to salvage, unless in a case where he goes beyond the ordinary duties attached to his employment."

The pilot laws of the several states generally require pilots to render aid to vessels, if possible, on their cruising ground whenever needed; and in cases when extraordinary risk and danger is thereby incurred, provision is made for extra compensation. The duties and compensation of an Oregon Columbia river bar pilot are prescribed by the pilot act of 1882. Sess. Laws, 15. The act (section 27) gives the pilot so much a foot draft of the vessel for his service; and (section 21) provides that he must keep a suitable pilot-boat, on which he shall cruise outside the bar "unless prevented by tempestuous weather," and he "must at all times promptly extend aid to vessels in stress of weather or in case of disaster: * * * provided, that this section shall not affect any claim for salvage arising out of services involving extraordinary danger and risk." Under this section 21 it was the duty of the libelant to extend to the Bryant whatever aid she might need and he, as pilot, could give, and in so doing he did not entitle himself to salvage or other compensation than that prescribed by law, unless he thereby incurred "extraordinary danger and risk." Neither the value of the vessel nor the benefit she receives from the service enter into the question of compensation. Unless the pilot incurs more than ordinary "danger and risk in the discharge of his duty, he is only entitled to the ordinary compensation. Whether this section includes the case of a wreck, properly speaking,—that is, a vessel abandoned at sea, or stranded and abandoned,—is a question not necessary to decide in this case. If it does, as it well may, the pilot must render what aid he can, as such, and if in so doing he does not incur extraordinary "danger or risk" he must be content with the ordinary compensation.

The Bryant was not a wreck in any sense of the word. She had just gone easily on to a sand-bank, where, if the weather had con-

tinued as calm as it then was, she might have remained for weeks without any serious injury. Her master and crew were on board, with reason to believe that the vessel could be floated off at the next tide, as she was; and, in any event, that the tugs would come to her assistance and pull her off as she went on. There is a conflict in the testimony as to whether the libelant boarded the vessel and took charge of her as a pilot or not. But there is not much room for doubt about the matter. He boarded her from a pilot schooner, saying he was a pilot, and did nothing while on board but a pilot's duty. It is true that the libelant testifies that he told the master after he got on board that his vessel was aground, and that he would not take charge as a pilot until she was afloat. But this, under the circumstances, is a very improbable statement, and was not remembered by the libelant on his examination in chief, nor until he was pressed on cross-examination; and it is absolutely denied by the master of the bark. But, be this as it may, the law did not authorize the libelant to go on board and take charge of the vessel, without the master's consent, in any other capacity than that of pilot. *The Dodge Healy*, 4 Wash. C. C. 656. This was not a case for a salvor, but a pilot, unless the former had a tug or other means external to the vessel at his command wherewith to pull her off the sand, with or without the aid of the wind and tide. But the libelant could be of no aid to the vessel personally, otherwise than from his knowledge of the tides, channels, and shoals in the vicinity, and his skill in handling her by means of her sails, rudder, and anchors, and all this he was bound to know and do as a pilot. If the master had possessed this local knowledge he could have sailed the Bryant over the sand into deep water as well as the libelant. Indeed, nothing was done by the latter except to set the sails and wait for the wind and tide, which fortunately—I may say providentially—came and pushed her over into the south channel. But even then, but for the local knowledge of the libelant, she might, in the darkness and fog, have gone on to Clatsop spit. The services rendered by the libelant were those of a pilot; and unless in boarding her, or while on her, he personally incurred "extraordinary danger and risk," he is not entitled to anything more than a pilot's compensation therefor; and this is so whether or not his services saved the vessel from a great peril or imminent danger of destruction.

I hardly know how to discuss the question of the "danger and risk" incurred by the libelant personally. I suppose that a bar pilot, when on duty, is always involved in more or less danger. He is bound to cruise outside the bar, and board and render aid to vessels, unless the weather is so "tempestuous" as to prevent it—as to make it absolutely unsafe to do so. In this case, in my judgment, the libelant did not incur even the ordinary danger of a pilot service in that locality. It was a remarkably calm time—not wind enough to clear the bar of the smoke and fog incident to that season of the year.

There was a light breeze from the north-west, and the ebb tide made a ripple on the sand where the vessel lay aground. On sighting the Bryant, the Cousins ran down from the windward and hove-to some distance astern and south of the former, from whence the libelant, with the aid of another oarsman, undertook to pull up to the Bryant in a small boat, but on account of the wind and tide, particularly the latter, was unable to do so, and had to return to the schooner, which by this time had drifted further to the southwest. The schooner then beat up into the vicinity of the Bryant and hove-to again under the lee of the latter, in comparatively still water, from whence the libelant, with the aid of the oarsman, boarded her without any trouble; the latter taking the boat back to the schooner, which then, by the libelant's direction, stood out to sea. In all this there was some time and labor spent, and much of it because of the libelant's mistake in not bringing his schooner around under the lee of the Bryant in the first instance, but certainly no "extraordinary danger or risk." And while on the vessel the libelant incurred no such danger or risk; for if there was any immediate prospect or probability of her going to pieces on the sand or sinking in the deep water, as there was not the least, all hands could safely have taken to the boats. But the libelant has himself furnished very satisfactory evidence that he did not, at the time, regard this service as dangerous, or otherwise than an ordinary pilot service. On September 6th, it appears that he made out a bill against the Bryant for "pilotage" at the prescribed rates, amounting to the sum of $136, and delivered the same to the agent of the schooner for collection, and as his report of the transaction, which was paid accordingly. Nothing then appears to have been said or thought of any claim for salvage on account of any unusual danger or risk incurred by the libelant in this service.

There must be a decree for the claimant dismissing the libel, and for costs